
IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs January 10, 2017

**KHALEEFA LAMBERT v. STATE OF TENNESSEE**

**Appeal from the Circuit Court for Montgomery County**
**No. 40900680        William R. Goodman, III, Judge**

_____

**No. M2016-01059-CCA-R3-PC**
_____

Khaleefa Lambert ("the Petitioner") was found guilty of first degree murder and especially aggravated kidnapping by a Montgomery County jury, for which the Petitioner received a sentence of life plus eighteen years. This court affirmed the Petitioner's convictions and sentences, and our supreme court denied further review. The Petitioner filed a petition for post-conviction relief alleging ineffective assistance of counsel, which the post-conviction court denied. On appeal, the Petitioner argues that trial counsel rendered ineffective assistance based on trial counsel's failure to: (1) investigate evidence and case law that would have contradicted the State's argument of premeditation; (2) discuss jury selection with the Petitioner; and (3) discuss the decision to testify with the Petitioner. After a thorough review of the record and applicable case law, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and ROBERT W. WEDEMEYER, J., joined.

Gregory D. Smith, Clarksville, Tennessee, for the petitioner, Khaleefa Lambert.

Herbert H. Slatery III, Attorney General and Reporter; Andrew C. Coulam, Assistant Attorney General; John W. Carney, District Attorney General; and Lee Willoughby, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I. Factual and Procedural Background**

This court summarized the facts of this case in its opinion for the Petitioner's direct appeal as follows:

The grand jury returned a multi-count indictment against the [Petitioner], charging him with the murder and kidnapping of his wife, eighteen-year-old Ashley Barnes. At trial, the proof revealed that the victim was in the Army and was stationed at Fort Campbell, Kentucky. On November 14, 2008, she married the [Petitioner], and she was deployed to Jalalabad, Afghanistan, on December 18, 2008.

Clarksville attorney Adrian Bohnenberger testified that shortly before the victim was deployed, she contacted him about obtaining an uncontested divorce from the [Petitioner]. A few weeks before the victim returned from overseas, the [Petitioner] called Bohnenberger and said he would not sign the divorce papers without being paid "a rather absurd" amount of money as compensation for the loss of support he was receiving from the Army. Bohnenberger informed the [Petitioner] that the victim was trying to have the [Petitioner]'s military support payments discontinued, and the [Petitioner] became agitated. The [Petitioner] never indicated that he did not want to divorce the victim; he was merely concerned about the money he would receive. After the [Petitioner]'s refusal to sign papers for an uncontested divorce, the victim told Bohnenberger she wanted to pursue a contested divorce.

The victim's mother, Michelle Bosarge, testified that on February 28, 2009, the victim flew to Nashville and that Bosarge met her there. They spent a few days together at Bosarge's home in Mobile, Alabama, and the victim left for Clarksville, Tennessee, on March 5, 2009, to pursue her divorce from the [Petitioner].

Katelyn Rondeau and her boyfriend, Lavell Traylor, testified that on the night of Friday, March 6, 2009, the victim stayed at a Microtel Inn in Clarksville. Rondeau, Traylor, Benita Gold, and a man named Nathaniel came to the victim's room, and they watched television and drank alcohol. Rondeau and Traylor said that the victim never gave any indication that she might be having an extramarital affair. However, she did express her desire to divorce the [Petitioner]. While in the motel room, the victim received calls from the [Petitioner] on her cellular telephone. The victim used the speakerphone feature, and Rondeau and Traylor heard the [Petitioner] beg the victim to not leave him. Everyone in the motel room was intoxicated and laughed during the call.

Rondeau and Traylor estimated that they, Gold, and Nathaniel left the motel room sometime around 3:00 a.m. or 4:00 a.m. The victim was planning to go to bed when they left.

Tiffany Almeyda, a friend of the [Petitioner] who lived in his apartment complex, testified that on the night of March 6, 2009, the [Petitioner] called and asked her to pick him up at a gas station in Clarksville. Brittany Randolph Gribble and Brittany Lester testified that they accompanied Almeyda. The [Petitioner] was in a good mood. When they arrived at the apartment complex around 1:00 or 2:00 a.m., the [Petitioner] asked if he could borrow Almeyda's white 2007 Mercury Mariner to visit his son, and Almeyda agreed. No knives or other weapons were in the vehicle at that time.

Jonathan Haynes, a front desk clerk at the Microtel Inn, testified that around 3:30 or 4:00 a.m., the [Petitioner] came into the lobby and asked for the victim's room number, saying that she was his wife and that he was trying to surprise her for their anniversary. Haynes refused, and the [Petitioner] offered Haynes twenty dollars to reveal the information. Haynes offered to call the victim's room to verify that the [Petitioner] was supposed to be there, but the [Petitioner] asked him to not do that because it would ruin the surprise. The [Petitioner] tried to look over the counter to see the registry or the computer. After his attempts to discover the victim's room number proved fruitless, he whispered, "[D]amn." The [Petitioner] paced in the lobby for about fifteen to thirty minutes, Haynes asked him to leave, and he left.

Army Lieutenant Shanda Garth, who acted as a liaison between deployed servicemen and servicewomen and their family members, testified that the [Petitioner] called her around 6:00 a.m. on March 7. The [Petitioner] had contacted Lieutenant Garth on previous occasions about support payments from the Army and to complain that the victim wanted to divorce him. Lieutenant Garth helped the [Petitioner] with financial matters but advised him that she could not help with personal matters. On the morning of March 7, the [Petitioner] told Lieutenant Garth that the victim was in a hotel with another man. Lieutenant Garth once again advised the [Petitioner] that she could not assist him with relationship matters. After a "pregnant pause," the [Petitioner] said, "[A]ll right, ma'am," and hung up. Lieutenant Garth denied she advised the [Petitioner] that he needed photographic proof of the victim's adultery.

Doris Henson testified that she arrived at the Microtel Inn around 5:30 or 6:00 a.m. on March 7, 2009, to relieve Haynes at the front desk. At 9:18 a.m., the victim, who was alone, checked out of the motel. Henson noticed that the victim had long, black hair that was "done up real pretty" and that she was talking on a cellular telephone. Henson did not see anyone running in the hallway of the motel that morning.

Brenda Stacey testified that around 9:00 a.m., she and her husband were driving by the Microtel Inn. Stacey saw a white sport utility vehicle (SUV) and the victim's car in the parking lot. A man ran in front of the SUV, grabbed a woman who was trying to get into her car, and shook her. The man was black, taller than the woman, thin, and had "close braids." The woman was shorter than the man and had shoulder-length dark hair. …

Shawntika Majors, the mother of the [Petitioner]'s son, testified that around 5:30 or 6:00 a.m. on the morning of March 7, 2009, she called the [Petitioner] and asked about babysitting while she went to work. During the call, the [Petitioner] sounded upset and said that he was going to speak with the victim at a motel. Majors advised the [Petitioner] to "let it go," and the call ended.

Thereafter, Majors, who was supposed to be at work around 8:00 a.m., repeatedly attempted to call the [Petitioner]. At approximately 8:45 or 9:00 a.m., the [Petitioner] returned her calls and told her to tell their son that the [Petitioner] loved him. Majors asked what had happened, and the [Petitioner], who was crying, said that he "hurt her." Majors assumed the [Petitioner] was referring to the victim. Majors "heard something in the background like someone trying to catch their breath." Majors advised the [Petitioner] to go to the hospital, but he stated that "he was going to drive until he ran out of gas."

The [Petitioner]'s sister, Shanesha L. Jackson, testified that a little after 9:00 a.m., the [Petitioner] called her. He was crying, told her that he loved her, and asked her to tell the rest of his family that he loved them. When Jackson asked what was wrong, the [Petitioner] responded that "he done messed up" and that he thought he had hurt the victim because he "cut her." Jackson inquired as to the victim's condition and whereabouts. The [Petitioner] said that the victim was "in the back," that he was talking to her, and that he was going to take her to the hospital. Jackson encouraged the [Petitioner] to take the victim to the hospital quickly and assured him that she would meet him at the hospital. When the [Petitioner]'s cellular

telephone started failing, he asked Jackson to call 911 to tell them he was in a white truck and that he was on his way to the hospital. Jackson's call with the [Petitioner] lasted approximately ten minutes.

Tennessee Highway Patrol Trooper Krystal Mathis testified that around 10:00 a.m., she was stationed on the westbound side of Interstate 24 near the 1.5 mile marker when she saw in her rearview mirror a white SUV swerve behind her police cruiser then pull back into traffic. Trooper Mathis activated her emergency equipment, and the SUV immediately pulled in front of the cruiser and parked. Trooper Mathis approached the SUV on the passenger side. At Trooper Mathis' instruction, the [Petitioner], who was driving the vehicle, unlocked the passenger door. Trooper Mathis opened the door and saw the [Petitioner]'s hand wrapped in a bloody towel or tissue. The [Petitioner] was crying. When Trooper Mathis asked why he was crying, the [Petitioner] said that he did not mean to "hurt her." Trooper Mathis asked to whom he was referring, and the [Petitioner] looked over his shoulder toward the rear of the vehicle. Trooper Mathis then saw the body of a female in the back floorboard. The victim's head and upper body were behind the driver's seat, which "was pushed all the way back." Trooper Mathis asked the [Petitioner] what he had done to the victim. The [Petitioner] replied that the victim was cheating on him but that he did not mean to hurt her. Trooper Mathis tapped the victim's leg and spoke to her, but the victim was unresponsive. The [Petitioner] said that the victim was not dead and was only sleeping. Trooper Mathis obtained the [Petitioner]'s identification and asked him to step out of the vehicle. She handcuffed the [Petitioner] and placed him in the back of the cruiser. Trooper Mathis did not see a weapon in the SUV.

While the [Petitioner] was in the back of the police car, he told Trooper Mathis that he saw the victim at a motel "all hugged up with a man." The [Petitioner] said that when he approached them, the man ran away. The [Petitioner] grabbed the victim and put her in the SUV. The [Petitioner] said that he had called the victim's lieutenant around 8:00 a.m. to report the victim was cheating on him and that the lieutenant advised him to obtain photographic proof of the affair.

Clarksville Police Sergeant Joe Difiore testified that he went to the Microtel Inn on March 7 to assist at the crime scene unit. Sergeant Difiore saw some dark red spots on the black pavement, which he believed were blood stains. Detective Tim Finley testified that he swabbed the stains for testing.

- 5 -

Clarksville Police Detective Alan Charvis testified that in the morning hours of March 7, he was informed of the incident on the interstate and that he went into the office of the Major Crimes Unit to begin gathering information. He learned that the [Petitioner] was in custody and had been transported to the hospital for treatment of his injuries. Detective Charvis obtained information about the victim and contacted her mother.

Detective Charvis had the SUV the [Petitioner] was driving, with the victim's body still inside, towed to a bay at the Major Crimes Unit's office. He learned that the [Petitioner] had borrowed the vehicle from Almeyda. Detective Charvis did not believe the victim was familiar with the vehicle.

Detective Charvis said that the victim's body was in the back floorboard of the vehicle, with her upper body behind the driver's seat. He noticed that the driver's seat "was pushed back and the seat back was laid back" over the victim's body. A knife blade was sticking out of the victim's neck; the broken handle from the knife was found near the seatbelts in the backseat.

Steve Scott with the Tennessee Bureau of Investigation (TBI) firearms and tool mark identification unit testified that he examined the knife blade and determined that the blade was four inches long, was serrated on one edge, and was smooth on the other edge.

Detective Charvis testified that the victim's Chevrolet Cobalt was brought to a bay at the Major Crimes Unit's office. When it arrived, Detective Charvis discovered that the left rear tire of the vehicle was flat and that the tire had been punctured.

Scott testified that he examined the puncture and determined that the tire was cut by a blade similar to the one found in the victim's neck. However, he was unable to find sufficient individual characteristics to definitively link that knife to the cut tire.

Detective Charvis testified that he interviewed the [Petitioner] around 4:00 p.m. on March 7 and that he recorded the interview. During the interview, the [Petitioner] said that he and the victim met on the [i]nternet site, Myspace. They were together approximately seven months before her death. [The Petitioner] said that on March 6, the victim came to his house, and they talked. The next morning, he went to the motel after

speaking with Lieutenant Garth. The [Petitioner] maintained that he had repeatedly complained about the victim having an affair and that Lieutenant Garth had advised him that he needed proof of adultery, such as photographs or an audio recording. The [Petitioner] said that he went to the motel but denied flattening the victim's tire. The [Petitioner] saw the victim and a black man "hugged up" in a hallway leading out of the motel. The [Petitioner] said that he was 6'3", the victim was 5'5", and the man was approximately 5'9" with a "low haircut." The [Petitioner] advanced on the victim, and the man ran. The [Petitioner] grabbed the victim and put her in the SUV. He stabbed her with a kitchen knife he found in the SUV and thought he must have cut his hand on the knife. The [Petitioner] could not recall if he stabbed the victim in the parking lot or inside the SUV. He drove away from the motel and got on the interstate headed toward Kentucky. He talked to the victim while he drove. Outside of Fort Campbell, he called 911 to report that he was on the way to the hospital with the victim. However, the battery of his cellular telephone died, and he was unable to convey the information. When he saw Trooper Mathis, he pulled over in front of her and told her, "I hurt my wife." The [Petitioner] said that he thought he stabbed the victim but that he could not completely remember. He said that "it was like a blank in and blank out." The [Petitioner] confirmed that he called his sister and that he asked the motel clerk to disclose the victim's room number. The [Petitioner] stated that he might have "just snapped."

Army Sergeant Toney McClelland, who was stationed in Afghanistan with the victim, testified that he never saw any indication that the victim was engaging in an extramarital affair. Additionally, the victim's stepfather, Howard Bosarge, testified that he was in Afghanistan at the same time as the victim, that he saw her on a daily basis, and that he never saw evidence of an affair.

Forensic pathologist Dr. Thomas Deering testified that he performed an autopsy on the victim's body and discerned that the victim's death was caused by multiple sharp force injuries consisting of stab wounds, incised wounds, and "flick marks." The victim had an incised wound to the top right of the head that fractured the outer surface of the skull and another incised wound to the right index finger. There were stab wounds behind, below, and in front of the ear; to the left side of the neck above the collarbone; and near the right wrist. There were two additional sharp force injuries to the right side of the neck and "flick marks" to the abdomen. These wounds would have been painful but not fatal. However, two

wounds were potentially fatal. One of the potentially fatal wounds was a 4" deep stab wound to the abdomen that cut the loop of the small bowel, went through the mesentery of the bowel, and cut the inferior vena cava. The wound would have been fatal within days if not treated. Additionally, a knife blade was embedded 4 ¼" to 4 ½" in the right side of the neck. The wound incised the right internal carotid artery, went behind the trachea and esophagus, and came out in front of the left vertebral artery. The wound was fatal, causing heavy bleeding that would have led to death in minutes. Dr. Deering could not specifically say how long the victim had lived but estimated that it could have been between five and twenty-five minutes but not as long as an hour. He also did not know if the location of the wound would have rendered the victim speechless. He said that the victim would have been conscious and capable of movement until blood loss eventually rendered her unconscious.

TBI Special Agent Jennifer Shipman with the serology/DNA laboratory testified that she tested three of four swabs taken from the motel parking lot. All of the swabs were consistent with the [Petitioner]'s blood. Agent Shipman also tested the victim's underwear and found spermatozoa that matched the [Petitioner]'s DNA, which she explained was consistent with the victim and the [Petitioner] having sexual intercourse within seventy-two hours prior to the victim's death.

The jury found the [Petitioner] guilty of first degree premeditated murder, first degree felony murder, especially aggravated kidnapping by the use of a weapon, and especially aggravated kidnapping by the infliction of serious bodily injury. The trial court merged the first degree murder convictions and imposed a sentence of life imprisonment with the possibility of parole. The trial court merged the especially aggravated kidnapping convictions and sentenced the [Petitioner] to eighteen years. The [trial] court further ordered the sentences to be served consecutively.

State v. Khaleefa Lambert, No. M2011-01797-CCA-R3-CD, 2013 WL 791618, at *1-5 (Tenn. Crim. App. Mar. 4, 2013), perm. app. denied (Tenn. Aug. 14, 2013). On appeal, this court affirmed the Petitioner's convictions and sentences but vacated the judgments and remanded for entry of corrected judgments to reflect the mergers of the murder convictions and the especially aggravated kidnapping convictions. Id. at *1. Our supreme court denied further review.

The Petitioner filed a timely petition for post-conviction relief, arguing that lead trial counsel's performance was deficient and that he was prejudiced by lead trial counsel's deficient performance. At the post-conviction hearing, the Petitioner agreed that the main issues at his trial were whether the victim was having an affair and whether the killing was voluntary manslaughter or first degree premeditated murder. He stated that lead trial counsel began to represent him after his case was bound over to the Montgomery County Circuit Court. The Petitioner testified that he met with lead trial counsel many times, and he also met with a private investigator. He also stated that the State was initially seeking the death penalty and that co-counsel was assigned to his case, but the State later dropped that request. The Petitioner testified that he met with co-counsel several times and that he had no complaints about co-counsel's performance specifically.

The Petitioner testified that lead trial counsel did not sufficiently investigate Army Lieutenant Shanda Garth.[1] The Petitioner stated that lead trial counsel did not interview Lieutenant Garth until many months after the offenses occurred, and he testified that if Lieutenant Garth had been interviewed more quickly her statement would have corroborated his statement. The Petitioner agreed that Lieutenant Garth's statement would not have affected the facts of the victim's death at trial. The Petitioner also testified that lead trial counsel failed to properly investigate relevant phone records. The Petitioner testified that, if lead trial counsel had investigated the phone records of his call to Lieutenant Garth, the records would have shown that the call lasted "at least a hard [thirty] minutes," which would have contradicted Lieutenant Garth's testimony at trial that she spoke to the Petitioner for two to three minutes before the Petitioner's phone cut off. Additionally, the Petitioner testified that the phone records would have shown that he was emotional during his call with Lieutenant Garth, which would have supported his argument that he was guilty of voluntary manslaughter, not premeditated murder. The Petitioner also asserted that, if lead trial counsel had researched case law, lead trial counsel would have found case law with facts similar to the Petitioner's case that could have been used to attack the State's premeditation argument. He stated that lead trial counsel did not object to statements made by the State during closing arguments, specifically the State's argument that that the jury should ignore the Petitioner's emotions and convict the Petitioner. The Petitioner stated that lead trial counsel did not request a change of venue and asserted that a change of venue was necessary because of media

---

[1]At various points in the record Ms. Garth is referred to as "Captain" and as "Lieutenant." Because Ms. Garth is referred to as Lieutenant in this court's direct appeal opinion, we will refer to her as Lieutenant Garth. We intend no disrespect.

attention about his case. The Petitioner agreed that media attention about the case was addressed with potential jurors during voir dire.

The Petitioner testified that, after the offenses, the police did not perform a breathalyzer test or blood draw to determine if the Petitioner was under the influence of alcohol and that lead trial counsel should have filed a motion or argued to the jury that the police should have conducted a breathalyzer test or blood draw on the Petitioner after the offenses. The Petitioner stated that he and lead trial counsel discussed whether the Petitioner should testify that he had been drinking before the offenses; however, he stated that no one was around him during the offenses that could have corroborated that he was impaired from alcohol. The Petitioner agreed that lead trial counsel informed him that, if he testified, the State could cross-examine him about his prior criminal record. The Petitioner stated that it was lead trial counsel's decision for the Petitioner to not testify.

The Petitioner testified that the State misrepresented testimony and that lead trial counsel did not object to the misrepresentation during trial. Additionally, he stated that lead trial counsel did not file a motion to suppress his confessions. The Petitioner testified that, if lead trial counsel had successfully moved for the suppression of the two statements, then "the things that [he had] said [would not have been] twisted into being premeditated . . . ." The Petitioner could not remember if he was informed of his Miranda rights before or during his encounter with the trooper, but he stated that he was informed of his Miranda rights before he gave a formal statement to the police. If his statements to law enforcement had been suppressed, the Petitioner explained that he could have based his argument for voluntary manslaughter on his statements to lead trial counsel.

On cross-examination, the Petitioner testified that he was originally represented by another attorney. He and original trial counsel discussed the State's plea offer, and after original trial counsel informed the State that he had rejected the plea offer, the State filed a death penalty notice and lead trial counsel replaced original trial counsel because lead trial counsel was certified to try death penalty cases. Regarding a motion for change of venue, the Petitioner testified that one potential juror was excused because the juror had heard of the Petitioner's case. The Petitioner stated that he never discussed his mental health with lead trial counsel. The Petitioner was unsure whether he had ever been treated for a mental health problem and whether lead trial counsel would have found any information on the Petitioner's mental health if lead trial counsel had looked for such records.

The Petitioner testified that prior to trial and during the trial he informed lead trial counsel that he wanted to testify, but lead trial counsel advised against testifying. He stated that, after the State rested its case, he still wanted to testify, but lead trial counsel

told his sister to convince him not to testify. The Petitioner agreed that his conversation with his sister regarding lead trial counsel's advice against testifying "affected [his] decision and [he] didn't make the [choice he] really wanted to make." He stated that suppression of his statement to the trooper and his formal confession to the police would have helped his case—even though evidence of his emotional state would have been suppressed—because he would have been convicted of something less than first degree murder.

Lead trial counsel testified that he had worked as an attorney for almost twenty-six years and had tried at least three murder cases. Lead trial counsel stated that he began to represent the Petitioner after the State filed a death penalty notice and that a fact investigator and a mitigation investigator also worked on the Petitioner's case. Lead trial counsel met with the Petitioner twenty-four times over two years through jail visits or correspondence and at seventeen court appearances. Additionally, he stated that the Petitioner received a copy of each of the approximately fifty motions or notices that were filed in his case. Lead trial counsel testified that the Petitioner's position on his conversation with Lieutenant Garth was that "she told him to go get evidence of marital infidelity[,]" but that Lieutenant Garth testified that she did not advise the Petitioner to obtain evidence. Lead trial counsel stated that a motion to change venue in the Petitioner's case would not have been successful. He agreed that neither the Petitioner nor the victim had significant ties to the Clarksville community. Regarding media attention on the Petitioner's case, he stated that "[t]here [were] a few news articles in March of 2009, when the event occurred. And then there was another article or two in December of 2009, when the State filed its capital notice. And beyond that, there wasn't a whole lot of media play at all."

Lead trial counsel testified that he did not remember whether a potential juror was excused because the juror was familiar with the case or whether a juror stated that she knew lead trial counsel. He also stated that he researched case law regarding premeditation in murder cases; however, he noted that researching case law had limited usefulness in a jury trial because an attorney cannot "quote case law to the jury." Lead trial counsel testified that the main issue at trial was the Petitioner's state of mind and that he played the Petitioner's 9-1-1 calls during the opening statement and closing argument "because that was the best evidence available of his state of mind at the time." Lead trial counsel testified that the Petitioner never indicated nor gave evidence that he was intoxicated during the commission of the offenses. He stated that none of the law enforcement officers that interacted with the Petitioner after the offenses stated that he was intoxicated. Lead trial counsel testified that the Petitioner never indicated a need for a mental evaluation, and the Petitioner did not request a mental health evaluation. Further, he stated that none of the other attorneys or investigators who assisted with the case ever saw a need for the Petitioner to undergo a mental health evaluation.

Lead trial counsel testified that portions of the State's closing argument made him uncomfortable, but he stated that the closing argument was not "so far out of bounds that [it] required [an] objection on the [spot], particularly given the strength of the evidence that was in the case." While he could not remember the Petitioner specifically indicated that he wanted to testify, his practice was to prepare any client who wanted to testify at their trial. He stated that he "d[id] not remember spending time with [the Petitioner] in preparation for his testimony[,]" which would indicate that the Petitioner did not want to testify. Lead trial counsel stated that the Petitioner's testimony would not have benefitted his case and would have exposed him to cross-examination. He also explained that the Petitioner's statements to police helped establish the Petitioner's argument that the offenses were not premeditated. Lead trial counsel testified that he did not remember speaking to the Petitioner's sister about whether the Petitioner should testify. He stated that "it is not [his] practice to have anybody else, outside of the defense team, talk to a client about their decision to testify or not testify."

On cross-examination, lead trial counsel testified that he did not raise the issue of prosecutorial misconduct during closing arguments in the Petitioner's motion for new trial or direct appeal. Lead trial counsel discussed trial strategies with the Petitioner, particularly whether the Petitioner should have accepted the State's open plea offer to second degree murder as a Range II offender. He stated that, if he had successfully suppressed either the Petitioner's statement to the trooper or his formal confession, then the Petitioner's 9-1-1 call and his calls to his family members likely would have been admitted and could have been used to establish the Petitioner's argument for voluntary manslaughter. However, he also stated that, if the statements were suppressed, then the Petitioner would have needed to testify to help establish this argument. Lead trial counsel stated that the Petitioner would have been able to testify with some preparation. Lead trial counsel agreed that the Petitioner's sister visited him while he was in jail but stated that he did not speak to the Petitioner's sister.

The post-conviction court denied relief to the Petitioner in a written order. The post-conviction court concluded that "[t]here was no showing as to what evidence existed that would have negated the motive shown by the evidence which was introduced at trial" and found that this issue was without merit. The post-conviction court found "no deficiencies in the representation of the Petitioner" and denied his petition for post-conviction relief. The Petitioner's timely appeal followed.

## II. Analysis

### *Standard of Review*

In order to prevail on a petition for post-conviction relief, a petitioner must prove all factual allegations by clear and convincing evidence. Jaco v. State, 120 S.W.3d 828, 830 (Tenn. 2003). Post-conviction relief cases often present mixed questions of law and fact. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001). Appellate courts are bound by the post-conviction court's factual findings unless the evidence preponderates against such findings. Kendrick v. State, 454 S.W.3d 450, 457 (Tenn. 2015). When reviewing the post-conviction court's factual findings, this court does not reweigh the evidence or substitute its own inferences for those drawn by the post-conviction court. Id.; Fields, 40 S.W.3d at 456 (citing Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997)). Additionally, "questions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the [post-conviction court]." Fields, 40 S.W.3d at 456 (citing Henley, 960 S.W.2d at 579); see also Kendrick, 454 S.W.3d at 457. The post-conviction court's conclusions of law and application of the law to factual findings are reviewed de novo with no presumption of correctness. Kendrick, 454 S.W.3d at 457.

### *Ineffective Assistance of Counsel*

The Petitioner argues that lead trial counsel's performance was deficient because he failed to investigate or research evidence on the Petitioner's heat of passion defense. The Petitioner alleges that trial counsel rendered ineffective assistance due to these deficiencies. The State responds that the Petitioner has not established that lead trial counsel's performance was deficient or that he was prejudiced.

On appeal, the Petitioner also argues that lead trial counsel's performance was deficient because he did not discuss jury selection or the decision to testify with the Petitioner. However, these grounds of deficient performance were not alleged in the Petitioner's original petition or his amended petition, and consequently, the post-conviction court did not set out conclusions of law regarding these grounds. They are therefore waived. See, e.g., Cauthern v. State, 145 S.W.3d 571, 599 (Tenn. 2004) ("[A]n issue raised for the first time on appeal is waived.").

The right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. In order to receive post-conviction relief for ineffective assistance of counsel, a petitioner must prove: (1) that counsel's performance was deficient; and (2) that the deficiency prejudiced the defense. Strickland v. Washington, 466 U.S. 668, 687 (1984);

see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (stating that the same standard for ineffective assistance of counsel applies in both federal and Tennessee cases). Both factors must be proven in order for the court to grant post-conviction relief. Strickland, 466 U.S. at 687; Henley, 960 S.W.2d at 580; Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996). Accordingly, if we determine that either factor is not satisfied, there is no need to consider the other factor. Finch v. State, 226 S.W.3d 307, 316 (Tenn. 2007) (citing Carpenter v. State, 126 S.W.3d 879, 886 (Tenn. 2004)). Additionally, review of counsel's performance "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689; see also Henley, 960 S.W.2d at 579. We will not second-guess a reasonable trial strategy, and we will not grant relief based on a sound, yet ultimately unsuccessful, tactical decision. Granderson v. State, 197 S.W.3d 782, 790 (Tenn. Crim. App. 2006).

As to the first prong of the Strickland analysis, "counsel's performance is effective if the advice given or the services rendered are within the range of competence demanded of attorneys in criminal cases." Henley, 960 S.W.2d at 579 (citing Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)); see also Goad, 938 S.W.2d at 369. In order to prove that counsel was deficient, the petitioner must demonstrate "that counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad, 938 S.W.2d at 369 (citing Strickland, 466 U.S. at 688); see also Baxter, 523 S.W.2d at 936.

Even if counsel's performance is deficient, the deficiency must have resulted in prejudice to the defense. Goad, 938 S.W.2d at 370. Therefore, under the second prong of the Strickland analysis, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. (quoting Strickland, 466 U.S. at 694) (internal quotation marks omitted).

The Petitioner testified at the post-conviction hearing that, if lead trial counsel had researched case law, he would have found case law to use at trial to attack the State's premeditation argument. Lead trial counsel stated that he researched case law regarding premeditation in murder cases; however, he noted that researching case law had limited usefulness in a jury trial because an attorney cannot "quote case law to the jury." The post-conviction court concluded that "[t]here was no showing as to what evidence existed that would have negated the motive shown by the evidence which was introduced at trial." The post-conviction court implicitly credited the testimony of lead trial counsel by finding "no deficiencies in the representation of the Petitioner[.]" On appeal, the Petitioner does not state what evidence lead trial counsel should have investigated or how

- 14 -

that evidence would have affected his trial.  The evidence in the record supports the post-conviction court's conclusion that lead trial counsel's performance was not deficient.  Because the Petitioner has failed to establish that lead trial counsel's performance was deficient, we need not address whether the Petitioner suffered any prejudice.  See Finch, 226 S.W.3d at 316.  The Petitioner is not entitled to relief on this ground.

### III. Conclusion

For the aforementioned reasons, the judgment of the post-conviction court is affirmed.

_____
ROBERT L. HOLLOWAY, JR., JUDGE
